**Diane HERCEG, and Andy V.,**
**Plaintiffs-Appellees,**
**Cross-Appellants,**

v.

**HUSTLER MAGAZINE, INC.,**
**Defendant-Appellant,**
**Cross-Appellee.**

No. 85–2833.

United States Court of Appeals,
Fifth Circuit.

April 20, 1987.

David H. Donaldson, Jr., Jack N. Price, Austin, Tex., for defendant-appellant, cross-appellee.

Clinard J. Hanby, Michael M. Essmyer, Haynes & Fullenweider, Houston, Tex., for plaintiffs-appellees, cross-appellants.

Before RUBIN, JOHNSON, and JONES, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

An adolescent read a magazine article that prompted him to commit an act that proved fatal. The issue is whether the publisher of the magazine may be held liable for civil damages.

I.

In its August 1981 issue, as part of a series about the pleasures—and dangers— of unusual and taboo sexual practices, *Hustler Magazine* printed "Orgasm of Death," an article discussing the practice of autoerotic asphyxia. This practice entails masturbation while "hanging" oneself in order to temporarily cut off the blood supply to the brain at the moment of orgasm. The article included details about how the act is performed and the kind of physical pleasure those who engage in it seek to achieve. The heading identified "Orgasm of Death" as part of a series on "Sexplay," discussions of "sexual pleasures [that] have remained hidden for too long behind the doors of fear, ignorance, inexperience and hypocrisy" and are presented "to increase [readers'] sexual knowledge, to lessen [their] inhibitions and—ultimately—to make [them] much better lover[s]."

An editor's note, positioned on the page so that it is likely to be the first text the reader will read, states: "Hustler emphasizes the often-fatal dangers of the practice of 'auto-erotic asphyxia,' and recommends that readers seeking unique forms of sexual release DO NOT ATTEMPT this method. The facts are presented here solely for an educational purpose."

The article begins by presenting a vivid description of the tragic results the practice may create. It describes the death of one victim and discusses research indicating that such deaths are alarmingly common: as many as 1,000 United States teenagers die in this manner each year. Although it describes the sexual "high" and "thrill" those who engage in the practice seek to achieve, the article repeatedly warns that the procedure is "neither healthy nor harmless," "it is a serious— and often-fatal—mistake to believe that asphyxia can be controlled," and "beyond a

doubt— ... auto-asphyxiation is one form of sex play you try only if you're anxious to wind up in cold storage, with a coroner's tag on your big toe." The two-page article warns readers at least ten different times that the practice is dangerous, self-destructive and deadly. It states that persons who successfully perform the technique can achieve intense physical pleasure, but the attendant risk is that the person may lose consciousness and die of strangulation.

Tragically, a copy of this issue of Hustler came into the possession of Troy D., a fourteen-year-old adolescent, who read the article and attempted the practice. The next morning, Troy's nude body was found, hanging by its neck in his closet, by one of Troy's closest friends, Andy V. A copy of *Hustler Magazine*, opened to the article about the "Orgasm of Death," was found near his feet.

Invoking the diversity jurisdiction of a federal court, Troy's mother, Diane Herceg, and Andy V. sued Hustler to recover damages for emotional and psychological harms they suffered as a result of Troy's death and for exemplary damages. Their original complaint alleged that Hustler was responsible for Troy's death on grounds of negligence, products liability, dangerous instrumentality, and attractive nuisance. In response, Hustler filed a motion to dismiss the complaint for failure to state a claim. The district court granted Hustler's motion on the basis that Texas law did not support some of the claims and others were barred by the first amendment, but it noted that the first amendment did not bar claims based on incitement and that it was "conceivable that plaintiffs could prove facts showing that Hustler's article was 'directed to inciting or producing' [Troy's death and] was 'likely to incite or produce' the death." It therefore granted leave to the plaintiffs to amend the complaint "to add an allegation of incitement." [1] The plaintiffs subsequently filed an amended complaint reasserting the claims previously raised and

adding an allegation that Troy had read the article and was incited by it to perform the act that resulted in his death. Hustler responded by filing a motion for summary judgment. The district court treated the motion as a motion to dismiss, granted the motion, and dismissed the suit insofar as it was based on any theory except incitement.

The incitement claim was then tried before a jury. Expert witnesses testified on behalf of both the plaintiffs and the defendant about the psychological implications of Troy's behavior and whether the magazine article implicitly advocated the practice it described or was likely to incite readers to attempt the procedure. The jury returned a verdict in favor of the plaintiffs awarding Diane Herceg $69,000 in actual damages and $100,000 exemplary damages and awarding Andy V. $3,000 for the pain and mental suffering he endured as the bystander who discovered Troy's body and $10,000 exemplary damages. Hustler moved for a judgment notwithstanding the verdict or for a new trial, and the plaintiffs moved to amend the judgment to provide for pre-judgment interest. The trial court denied both motions. Hustler appeals, but the plaintiffs do not cross appeal or raise any issue concerning the correctness of the district court order dismissing their other claims.

## II.

The constitutional protection accorded to the freedom of speech and of the press is not based on the naive belief that speech can do no harm but on the confidence that the benefits society reaps from the free flow and exchange of ideas outweigh the costs society endures by receiving reprehensible or dangerous ideas. Under our Constitution, as the Supreme Court has reminded us, "there is no such thing as a false idea. However, pernicious an opinion may seem we depend for its correction not on the conscience of judges and juries but

---

1. *Herceg v. Hustler Magazine, Inc.,* 565 F.Supp. 802 (S.D.Tex.1983), relying on *Zamora v. Columbia Broadcasting System,* 480 F.Supp. 199 (S.D.Fla.1979) and quoting from *Oliva N. v. National Broadcasting System,* 126 Cal.App.3d 488, 178 Cal.Rptr. 888 (1981).

on the competition of other ideas."[2] We rely on a reverse Greshom's law, trusting to good ideas to drive out bad ones and forbidding governmental intervention into the free market of ideas. One of our basic constitutional tenets, therefore, forbids the state to punish protected speech, directly or indirectly, whether by criminal penalty[3] or civil liability.[4]

The Supreme Court has recognized that some types of speech are excluded from, or entitled only to narrowed constitutional protection. Freedom of speech does not protect obscene materials,[5] child pornography,[6] fighting words,[7] incitement to imminent lawless activity,[8] and purposefully-made or recklessly-made false statements of fact such as libel, defamation, or fraud.[9] Whatever the problems created in attempting to categorize speech in such fashion,[10] the Hustler article fits none of them.

 Even types of speech protected generally by the first amendment may be subject to government regulation. Freedom of speech is not an absolute.[11] If the state interest is compelling and the means of regulation narrowly tailored to accomplish a proper state purpose, regulation of expression is not forbidden by the first amendment. The extent of the danger created by a publication therefore is not immaterial in determining the state's power to penalize that publication for harm that ensues, but first amendment protection is not eliminated simply because publication of an idea creates a potential hazard. Whether the Hustler article, therefore, placed a dangerous idea into Troy's head is but one factor in determining whether the state may impose damages for that consequence. Against the important social goal of protecting the lives of adolescents like Troy, the Constitution requires us to balance more than Hustler's right to publish the particular article, subject to the possibility of civil liability should harm ensue, but also the danger that unclear or diminished standards of first amendment protection may both inhibit the expression of protected ideas by other speakers and constrict the right of the public to receive those ideas.[12]

While the plaintiffs alleged several different bases of liability in their original amended complaint, the issue tried was the imposition of liability on the basis of incitement, and that is the sole basis for the verdict. The question before us therefore is whether, as a matter of law, the language of "Orgasm of Death" may be defined as incitement for purposes of removing that speech from the purview of first amendment protection. If not, the judgment entered on the jury verdict cannot be

**2.** *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974) (footnote omitted).

**3.** *See, e.g., Hess v. Indiana,* 414 U.S. 105, 107–08, 94 S.Ct. 326, 328, 38 L.Ed.2d 303 (1973); *Gooding v. Wilson,* 405 U.S. 518, 521–22, 92 S.Ct. 1103, 1106, 31 L.Ed.2d 408 (1972); *Brandenburg v. Ohio,* 395 U.S. 444, 447–48, 89 S.Ct. 1827, 1829–30, 23 L.Ed.2d 430 (1969); *Edwards v. South Carolina,* 372 U.S. 229, 237, 83 S.Ct. 680, 684, 9 L.Ed.2d 697 (1963).

**4.** *New York Times v. Sullivan,* 376 U.S. 254, 277, 84 S.Ct. 710, 724, 11 L.Ed.2d 686 (1964).

**5.** *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957).

**6.** *New York v. Ferber,* 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982).

**7.** *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).

**8.** *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969).

**9.** *See, e.g., Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Beauharnais v. Illinois,* 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919 (1952); *Schneider v. State,* 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939). *See also Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 504 n. 22, 104 S.Ct. 1949, 1961 n. 22, 80 L.Ed.2d 502 (1984).

**10.** *See* Gunther, Constitutional Law 1046 (11th ed. 1985).

**11.** *Konigsberg v. State Bar of California,* 366 U.S. 36, 49, 81 S.Ct. 997, 1005, 6 L.Ed.2d 105 (1961), *reh. denied,* 368 U.S. 869, 82 S.Ct. 21, 7 L.Ed.2d 69 (1961).

**12.** *Columbia Broadcasting System v. Democratic National Committee,* 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973).

affirmed even if it is conceivable that, had the case been tried on some other ground, the jury might have reached the same verdict.[13]

### III.

Appellate review of jury findings in cases implicating first amendment rights must remain faithful both to the substantial evidence standard set forth in Rule 52(a)[14] and the constitutional obligation of appellate courts "to 'make an independent examination of the whole record' in order to make sure 'that the judgment does not constitute a forbidden intrusion on the field of free expression.'"[15] Although we must accept the jury's fact findings if they are fairly supported by the record, that requirement "does not inhibit an appellate court's power to correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law."[16]

The text of the Hustler article provides the best basis for deciding whether the article may be held to have incited Troy's behavior. The jury was also entitled to consider evidence concerning whether Troy read the article immediately prior to attempting the autoerotic asphyxiation procedure, the psychiatric testimony about the likely effect such an article would have on normal adolescent readers, and the evidence about the probable state of his mind at the time he entered upon the experiment that resulted in his death. Although the jury was not asked to answer special interrogatories establishing what evidence they credited or discredited, it is apparent from the verdict that the jurors believed the testimony leading to the conclusion that Troy had read the article immediately before he entered in the acts that proved fatal and that his reaction to the article was not the result of any clinical psychological abnormality. Because these conclusions are adequately supported by evidence in the record, we accept them as true.

■ We are not free, however, as the Supreme Court's recent decision in *Bose Corporation v. Consumer's Union* holds, to accept the jury's mixed finding of fact and law that the article culpably incited Troy's behavior without conducting "an independent review of the record both to be sure the speech in question actually falls within the unprotected category and to confine the perimeters of any unprotected category within acceptably narrow limits in an effort to ensure that protected expression will not be inhibited."[17]

■ Although we are doubtful that a magazine article that is no more direct than "Orgasm of Death" can ever constitute an incitement in the sense in which the Supreme Court—in cases we discuss below—has employed that term to identify unprotected speech the states may punish without violating the first amendment, we first analyze the evidence on the theory that it might satisfy doctrinal tests relating to incitement, for that was the theory under which the case was tried and submitted. Substituting our judgment for the jury's, as we must, we hold that liability cannot be imposed on Hustler on the basis that the article was an incitement to attempt a potentially fatal act without impermissibly infringing upon freedom of speech.

The word incitement, like many of the words in our complex language, can carry

---

13. *See Dees v. W.M. Webb, Inc.,* 590 F.2d 144, 146 (5th Cir.1979); *Short v. United Mine Workers of America 1950 Pension Trust,* 728 F.2d 528, 532 n. 6 (D.C.Cir.1984) (citing *Kassman v. American University,* 546 F.2d 1029, 1032 (D.C.Cir. 1976) (per curiam)); *Chesapeake & Ohio Railway Co. v. Illinois Central Gulf Railroad Co.,* 564 F.2d 222, 226 (7th Cir.1977), *cert. denied,* 435 U.S. 919, 98 S.Ct. 1515, 55 L.Ed.2d 535 (1978); *Santa Clara Valley Distributing v. Pabst Brewing Co.,* 556 F.2d 942, 946 (9th Cir.1977).

14. *See, e.g., Mack v. Newton,* 737 F.2d 1343, 1350 (5th Cir.1984); *Gross v. Black and Decker (U.S.), Inc.,* 695 F.2d 858 (5th Cir.1983).

15. *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 499, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502 (1984) (quoting *New York Times v. Sullivan,* 376 U.S. 254, 284–86, 84 S.Ct. 710, 728–29, 11 L.Ed.2d 686 (1964)).

16. *Id.,* 104 S.Ct. at 1960 (citations omitted).

17. 104 S.Ct. at 1962.

different meanings. It is properly used to refer to encouragement of conduct that might harm the public such as the violation of law or the use of force. But when the word is used in that context, the state may not punish such an inducement unless the speech involved is, as the Supreme Court held in *Brandenburg v. Ohio*,[18] "directed to inciting or producing *imminent* lawless action and ... *likely* to incite or produce such action."[19]

Brandenburg, a Ku Klux Klan leader garbed in Klan regalia, had delivered a speech threatening that, "if our President, our Congress, our Supreme Court, continues to supress the white, caucasion race, it is posible that there might have to be some revengence (sic) taken." He challenged his conviction under an Ohio statute that punished "advocacy of the duty, necessity, or propriety of crime, sabotage, violence, or unlawful methods of terrorism as a means of accomplishing industrial or political reform."[20] The Supreme Court reversed his conviction because neither the statute nor the state court's jury instruction distinguished between advocacy and incitement to imminent lawless action, and only the latter might constitutionally be forbidden.

Hustler argues that *Brandenburg* provides the controlling principle, and the plaintiffs assume that it may. If that were so, it would be necessary for the plaintiffs to have proved that:

1. Autoerotic asphyxiation is a lawless act.

2. Hustler advocated this act.

3. Hustler's publication went even beyond "mere advocacy" and amounted to incitement.

4. The incitement was directed to imminent action.

The *Brandenburg* focus is repeated in subsequent Supreme Court decisions. Thus, in *Hess v. Indiana*,[21] the Court held provocative remarks by a demonstrator to the police could not be punished on the basis that they had a tendency to lead to violence because there was no evidence that, or rational inference from, the import of the language that "[the] words [used] were intended to produce, and likely to produce, *imminent* disorder."[22]

The crucial element to lowering the first amendment shield is the imminence of the threatened evil. In *Hess*, the Court was faced with the question of whether an anti-war demonstrator could be punished under Indiana's disorderly conduct statute for loudly shouting, "We'll take the fucking street later," as police attempted to move the crowd of demonstrators off the street so that vehicles could pass. The Court noted that, viewed most favorably to the speaker, "the statement could be taken as counsel for moderation" and, at worst, as "advocacy of illegal action at some indefinite future time."[23] The Court reasoned that, "[s]ince the uncontroverted evidence showed that Hess' statement was not directed to any person or group of persons, it cannot be said that he was advocating, in the normal sense, any action. And since there was no evidence or rational inference from the import of the language, that his words were intended to produce, and likely to produce, *imminent* disorder, those words could not be punished ... on the ground that they had 'a tendency to lead to violence.' "[24]

We need not decide whether Texas law made autoerotic asphyxiation illegal or whether *Brandenburg* is restricted to the advocacy of criminal conduct. Even if the article paints in glowing terms the pleas-

**18.** 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969).

**19.** *Id.,* 395 U.S. at 447, 89 S.Ct. at 1829 (emphasis added).

**20.** Ohio Rev.Code Ann. § 2923.13 (repealed 1971).

**21.** 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973).

**22.** *Id.,* 414 U.S. at 109, 94 S.Ct. at 329 (emphasis in original). *See also Watts v. United States,* 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (per curiam).

**23.** 414 U.S. at 108, 94 S.Ct. at 328.

**24.** *Id.,* 414 U.S. at 108–09, 94 S.Ct. at 329 (citations omitted; emphasis in original).

ures supposedly achieved by the practice it describes, as the plaintiffs contend, no fair reading of it can make its content advocacy, let alone incitement to engage in the practice.

Herceg and Andy V. complain that the article provides unnecessary detail about how autoerotic asphyxiation is accomplished. The detail is adapted from an article published by a psychiatrist in the *Journal of Child Psychiatry*. Although it is conceivable that, in some instances, the amount of detail contained in challenged speech may be relevant in determining whether incitement exists, the detail in "Orgasm of Death" is not enough to permit breach of the first amendment. The manner of engaging in autoerotic asphyxiation apparently is not complicated. To understand what the term means is to know roughly how to accomplish it. Furthermore, the article is laden with detail about all facets of the practice, including the physiology of how it produces a threat to life and the seriousness of the danger of harm.

Under *Brandenburg*, therefore, the article was entitled to first amendment protection. But the parties' and, apparently, the district court's effort to apply the *Brandenburg* analysis to the type of "incitement" with which Hustler was charged appears inappropriate. Incitement cases usually concern a state effort to punish the arousal of a crowd to commit a criminal action. The root of incitement theory appears to have been grounded in concern over crowd behavior. As John Stuart Mill stated in his dissertation, *On Liberty*, "An opinion that corn-dealers are starvers of the poor, or that private property is robbery ought to be unmolested when simply circulated through the press, but may justly incur punishment when delivered orally to an excited mob assembled before the house of a corn-dealer."[25] In *Noto v. United States*,[26] the Supreme Court expressed similar views about incitement: "the mere abstract teaching ... of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steering it to such action."[27] Whether written material might ever be found to create culpable incitement unprotected by the first amendment is, however, a question that we do not now reach.

## IV.

■ Herceg and Andy V. contend that, while the first amendment might prevent the state from punishing publication of such articles as criminal, it does not foreclose imposing civil liability for damages that result from publication. In *New York Times v. Sullivan*, the Supreme Court held, "what a State may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil law of libel," because the fear of civil liberty might be "markedly more inhibiting than the fear of prosecution under a criminal statute."[28] The same rationale forbids the state to impose damages for publication of "Orgasm of Death" if it could not constitutionally make the publication of that article a crime.

One state Supreme Court decision, however, may be read to imply that the state may impose civil liability in such a situation. In *Weirum v. RKO General, Inc.*,[29] the Supreme Court of California held that a radio station catering primarily to teenagers could be held liable for wrongful death damages arising from an accident caused when two youths who listened to a promotional broadcast engaged in a street race in order to be the first to reach the site at which the station had announced prize money would be given away. Most

---

**25.** 367 U.S. 290, 81 S.Ct. 1517, 6 L.Ed.2d 836 (1961).

**26.** *Id.,* 367 U.S. at 297–98, 81 S.Ct. at 1520–21.

**27.** *See also Brandenburg*, 395 U.S. at 448, 89 S.Ct. at 1830; *Herndon v. Lowry*, 301 U.S. 242, 259–61, 57 S.Ct. 732, 739–40, 81 L.Ed. 1066

(1937); *Bond v. Floyd,* 385 U.S. 116, 134, 87 S.Ct. 339, 348, 17 L.Ed.2d 235 (1966).

**28.** 376 U.S. 254, 277, 84 S.Ct. 710, 724, 11 L.Ed.2d 686 (1964).

**29.** 15 Cal.3d 40, 123 Cal.Rptr. 468, 539 P.2d 36 (1975).

of the opinion dealt with whether the radio station owed a duty of care to the killed non-listener, and the first amendment defense was summarily rejected because "[t]he First Amendment does not sanction the infliction of physical injury merely because achieved by word, rather than act." [30]

As the California court itself noted, "virtually every act involves some conceivable danger." [31] The analysis employed by the California Supreme Court, however, provides no guidance for distinguishing between protected speech containing—or implying—dangerous ideas and speech so clearly and immediately dangerous and "of such slight social value as a step to truth that any benefit that may be derived from [it] is clearly outweighed by the social interest in order and morality." [32] Because the speech challenged was merely a promotional device to encourage listeners to continue listening to the radio station, it may have been entitled only to limited first amendment protection. [33] The broadcast announcements included light-hearted warnings that listeners should "get your kids out of the street" [34] because of the reckless driving that the announcement might incite, and no warning of any kind was given to urge listeners who sought to win the prizes to use discretion in driving. In contrast, the Hustler article, while published in a magazine published for profit, was not an effort to achieve a commercial result and, at least in the explicit meaning of the words employed, attempts to dissuade its readers from conducting the dangerous activity it describes.

## V.

■ In the alternative, Herceg and Andy suggest that a less stringent standard than the *Brandenburg* test be applied in cases involving non-political speech that has actually produced harm. Although political speech is at "the core of the First Amendment," [35] the Supreme Court generally has not attempted to differentiate between different categories of protected speech for the purposes of deciding how much constitutional protection is required. [36] Such an endeavor would not only be hopelessly complicated but would raise substantial concern that the worthiness of speech might be judged by majoritarian notions of political and social propriety and morality. If the shield of the first amendment can be eliminated by proving after publication that an article discussing a dangerous idea negligently helped bring about a real injury simply because the idea can be identified as "bad," all free speech becomes threatened. An article discussing the nature and danger of "crack" usage—or of hang-gliding— might lead to liability just as easily. As is made clear in the Supreme Court's decision in *Hess*, the "tendency to lead to violence" is not enough. [37] Mere negligence, therefore, cannot form the basis of liability under the incitement doctrine any more than it can under libel doctrine. [38]

## VI.

Finally, even if this court were to determine that the plaintiffs may establish a cause of action under a theory of negli-

---

**30.** 123 Cal.Rptr. at 472, 539 P.2d at 40.

**31.** *Id.*

**32.** *Chaplinsky,* 315 U.S. at 572, 62 S.Ct. at 769.

**33.** *Virginia State Board of Pharmacy v. Virginia Consumer Council,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) (overruling the holding in *Valentine v. Chrestensen,* 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942), that commercial speech enjoys no first amendment protection).

**34.** *Weirum,* 123 Cal.Rptr. at 470, 539 P.2d at 38.

**35.** *N.A.A.C.P. v. Claiborne Hardware Co.,* 458 U.S. 886, 926–27, 102 S.Ct. 3409, 3433, 73 L.Ed.2d 1215 (1982).

**36.** *But see Virginia State Board of Pharmacy, supra; Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983); *Central Hudson Gas v. Public Service Commission,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980); *Ohralik v. Ohio State Bar Association,* 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978); *In re Primus,* 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978).

**37.** 414 U.S. at 109, 94 S.Ct. at 329.

**38.** *Accord, Walt Disney Productions, Inc. v. Shannon,* 247 Ga. 402, 276 S.E.2d 580 (1981).

gence, that theory could not form the basis of affirming the decision below. Plaintiffs correctly argue that an appellee, without cross-appealing, may defend the judgment on any basis having support in the record.[39] This case, however, was not tried on a negligence theory. There are, therefore, no jury findings on the issue of negligence, and this court may not infer what those findings would have been had the issue been presented. The trial was conducted on an incitement theory after the plaintiffs' various other claims were dismissed. The defense prepared its defense accordingly. Had a negligence claim remained, Hustler may have settled out of court or pursued alternative defense strategies. To allow Hustler's victories at the summary judgment phase of trial to become a trap precluding it from preparing a negligence defense would be a miscarriage of justice.[40]

## VII.

Hustler's final challenge to the judgment below is to the award granted Andy V. as compensation for suffering he endured as a bystander to the tragedy. Because we have held that no liability can attach to Hustler's publication of "Orgasm of Death" under incitement theory, we need not decide whether Andy V. would have been entitled to recover damages under Texas tort law.

For the reasons stated above, the judgment of the district court is REVERSED.

EDITH H. JONES, Circuit Judge, Concurring and Dissenting:

I concur in the result in this case only because I am persuaded that plaintiffs had an obligation to cross-appeal the court's dismissal of their claims based on negligence, attractive nuisance, and strict liability or dangerous instrumentality. The majority correctly reason that Hustler should have had an opportunity to prepare a defense specifically tailored against any of these theories. Although I believe a tort claim is here defensible, the undeniable novelty of plaintiff's "incitement" theory does not permit us fairly to support the judgment below.

What disturbs me to the point of despair is the majority's broad reasoning which appears to foreclose the possibility that any state might choose to temper the excesses of the pornography business by imposing civil liability for harms it directly causes. Consonant with the first amendment, the state can protect its citizens against the moral evil of obscenity,[1] the threat of civil disorder or injury posed by lawless mobs[2] and fighting words[3], and the damage to reputation from libel or defamation[4], to say nothing of the myriad dangers lurking in "commercial speech."[5] Why cannot the state then fashion a remedy to protect its children's lives when they are endangered by suicidal pornography? To deny this possibility, I believe, is to degrade the free market of ideas to a level with the black market for heroin. Despite the grand

**39.** *French v. Estelle,* 692 F.2d 1021, 1024 n. 5 (5th Cir.1982), *cert. denied,* 461 U.S. 937, 103 S.Ct. 2108, 77 L.Ed.2d 313 (1983); *Weingart v. Allen & O'Hara, Inc.,* 654 F.2d 1096, 1106 (5th Cir.1981); *Lucas v. American Manufacturing Co.,* 630 F.2d 291, 294 (5th Cir.1980).

**40.** *See, e.g., Gilbert v. Medical Economics Co.,* 665 F.2d 305, 310 (10th Cir.1981); *System Operations v. Scientific Games Development Corp.,* 555 F.2d 1131, 1144–45 (3d Cir.1977).

**1.** *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973).

**2.** *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969).

**3.** *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).

**4.** *Dun & Bradstreet v. Greenmoss Builders, Inc.,* 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

**5.** *See, e.g., Posadas De Puerto Rico Association v. Tourism Company of Puerto Rico,* —— U.S. ——, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986); *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980); *Ohralik v. Ohio State Bar Association,* 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978); *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Counsel,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976).

flourishes of rhetoric in many first amendment decisions concerning the sanctity of "dangerous" ideas, no federal court has held that death is a legitimate price to pay for freedom of speech.

In less emotional terms, I believe the majority has critically erred in its analysis of this case under existing first amendment law. The majority decide at the outset that Hustler's "Orgasm of Death" does not embody child pornography, fighting words, incitement to lawless conduct, libel, defamation or fraud, or obscenity,[6] all of which categories of speech are entirely unprotected by the first amendment. Nor do they find in the article "an effort to achieve a commercial result," which would afford it modified first amendment protection. Comforted by the inapplicability of these labels, they then accord this article full first amendment protection, holding that in the balance struck between society's interest in Troy's life and the chilling effect on the "right of the public to receive ... ideas," Troy loses. Any effort to find a happier medium, they conclude, would not only be hopelessly complicated but would raise substantial concerns that the worthiness of speech might be judged by "majoritarian notions of political and social propriety and morality." I agree that "Orgasm of Death" does not conveniently match the current categories of speech defined for first amendment purposes. Limiting its constitutional protection does not, however, disserve any of these categories and is more appropriate to furthering the "majoritarian" notion of protecting the sanctity of human life. Finally, the "slippery slope" argument that if Hustler is held liable here, *Ladies Home Journal* or the publisher of an article on hang-gliding will next be a casualty of philistine justice simply proves too much: *This* case is not a difficult one in which to vindicate Troy's loss of life.

## I.

Proper analysis must begin with an examination of *Hustler* generally and this article in particular. *Hustler* is not a bona fide competitor in the "marketplace of ideas." It is largely pornographic, whether or not technically obscene. One need not be male to recognize that the principal function of this magazine is to create sexual arousal. Consumers of this material so partake for its known physical effects much as they would use tobacco, alcohol or drugs for their effects. By definition, pornography's appeal is therefore non-cognitive and unrelated to, in fact exactly the opposite of, the transmission of ideas.[7]

Not only is Hustler's appeal noncognitive, but the magazine derives its profit from that fact. If Hustler stopped being pornographic, its readership would vanish.

According to the trial court record, pornography appeals to pubescent males. Moreover, although sold in the "adults only" section of newsstands, a significant portion of its readers are adolescent. Hustler knows this. Such readers are particularly vulnerable to thrillseeking, recklessness, and mimickry. Hustler should know this. Hustler should understand that to such a mentality the warnings "no" or "caution" may be treated as invitations rather than taboos.

"Orgasm of Death" provides a detailed description how to accomplish autoerotic asphyxiation. The article appears in the "Sexplay" section of the magazine which, among other things, purports to advise its readers on "how to make you a much better lover."[8] The warnings and cautionary comments in the article could be seen by a jury to conflict with both the explicit and subliminal message of Hustler, which is to tear down custom, explode myths and ban-

---

**6.** Counsel for Hustler essentially conceded in the trial court that their magazine was obscene.

**7.** *See* Sunstein, "Pornography and the First Amendment," 1986 Duke L.J. 589, 606–07 (1986).

**8.** The introduction to the Sexplay section states: "Many sexual pleasures have remained hidden

for too long.... In keeping with HUSTLER's belief that the repression of natural and healthy urges is physically and emotionally damaging, we present this series of informative articles to increase your sexual knowledge, lessen your inhibitions and—ultimately to make you a much better lover."

ish taboos about sexual matters. The article trades on the symbiotic connection between sex and violence.[9] In sum, as Hustler knew, the article is dangerously explicit, lethal, and likely to be distributed to those members of society who are most vulnerable to its message. "Orgasm of Death," in the circumstances of its publication and dissemination, is not unlike a dangerous nuisance or a stick of dynamite in the hands of a child. Hustler's publication of this particular article bears the seeds of tort liability although, as I shall explain, the theory on which the case was tried is incorrect.

## II.

First amendment analysis is an exercise in line-drawing between the legitimate interests of society to regulate itself and the paramount necessity of encouraging the robust and uninhibited flow of debate which is the life-blood of government by the people. That some of the lines are blurred or irregular does not, however, prove the majority's proposition that it would be hopelessly complicated to delineate between protected and unprotected speech in this case. Such a formulation in fact begs the critical question in two ways. First, a hierarchy of first amendment speech classifications has in fact developed largely in the last few years,[10] and there is no reason to assume the hierarchy is ineluctable. Second, the essence of the judicial function is to judge. If it is impossible to judge, there is no reason for judges to pretend to perform their role, and it is a nonsequitur for them to conclude that soci-

ety's or a state's judgment is "wrong." Hence, in novel cases like this one, the reasons for protecting speech under the first amendment must be closely examined to properly evaluate Hustler's claim to unlimited constitutional protection.

The Supreme Court recently engaged in the balancing appropriate to a novel first amendment case in *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985).[11] The Court concluded that the victim of a negligently erroneous credit report might recover presumed and punitive damages from the publisher, in the absence of actual damages. In so doing, it evaluated the interest sought to be protected by the state against the level of first amendment interest embodied in the communication at issue.

The state's "strong and legitimate" interest in protecting one's reputation was at issue in *Gertz v. Robert Welch, Inc.*: "the individual's right to the protection of his own good name 'reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty. The protection of private personality, *like the protection of life itself,* is left primarily to the individual States under the Ninth and Tenth Amendments....'" 418 U.S. at 341, 94 S.Ct. at 3008 (quoting *Rosenblatt v. Baer*, 383 U.S. 75, 92, 86 S.Ct. 669, 679, 15 L.Ed.2d 597 (1966) (Stewart, J., concurring)) (emphasis added). *See also Dun & Bradstreet*, 472 U.S. at 757–58, 105 S.Ct. at 2945 (also quoting Justice Stew-

---

**9.** The Attorney General's Commission on Pornography concluded recently that the assumption that pornography has "no negative effects" is no longer tenable. *Attorney General's Commission on Pornography: Final Report*, Vol. I at 1031 (July 1986) (hereinafter cited as the *Commission Report*). The Commission concluded that there is a direct causal relationship between exposure to sexually violent materials and antisocial sexual violence and, with some segments of the population, with unlawful acts of violence. *Id.* at 326. The Commission also concluded that substantial exposure to degrading but "non-violent" sexual material, bears "some causal relationship to the level of sexual violence, sexual coercion, or unwanted sexual aggression in the population so exposed." *Id.* at

334. *See also* F. Schauer, *The Law of Obscenity* 62 (1976) (concluding that a significant proportion of research "indicates some relationship between pornography and antisocial conduct for those who, on account of other factors, would be so disposed in any account").

**10.** *See generally* G. Gunther, *Cases & Materials on Constitutional Law*, chs. 12, 13 (10th ed. 1980).

**11.** The holding in *Dun & Bradstreet* specifically states that the credit reports there involved did not constitute "commercial speech" as that term is understood for first amendment purposes. 472 U.S. at 762 n. 8, 105 S.Ct. at 2947 n. 8.

art's *Rosenblatt* statement). The interest in protecting life is recognized specifically for first amendment purposes and, analytically, can be no less important than the interest in reputation. The state's interest in this case is to protect the lives of adolescents who might be encouraged by pornographic publications and specifically instructed how to attempt life-threatening activities. In *NAACP v. Claiborne Hardware Company*, 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982), the Supreme Court assumed that if violence had broken out as a result of Charles Evers' incendiary speech, both the mob and the speaker could have been subjected to damage claims by the victims. For similar reasons, "fighting words" have long been outside the sphere of first amendment protection. *See Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). The Supreme Court has also dealt favorably with state regulations designed to protect minors from performing sexual acts by prohibiting distribution of films containing such acts. *New York v. Ferber*, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). There the Court found it "evident beyond the need for elaboration that a State's interest in 'safeguarding the physical and psychological wellbeing of a minor' is 'compelling'." 458 U.S. at 756–57, 102 S.Ct. at 3354, (quoting *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 607, 102 S.Ct. 2613, 2620, 73 L.Ed.2d 248 (1982)). The Court has even gone so far as to uphold an FCC regulation banning "indecent" speech from the airwaves at the times when children would be in the audience. *F.C.C. v. Pacifica Foundation*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978). States already regulate the distribution of pornography to minors, *see* Schauer, *supra* n. 9, at 196–97, and a remedy for the collateral consequences of unauthorized distribution, by way of a civil action for damages, would only serve to reinforce that regulation.

Permitting recovery of damages in defamation cases offers an analogous framework. Balanced against the state interest,

the Court held in *Dun & Bradstreet* that the first amendment interest at stake was less important than the one weighed in *Gertz*. 472 U.S. at 758, 105 S.Ct. at 2945. While *Gertz* involved a libelous publication on a matter of public concern, the false information in *Dun & Bradstreet* was contained in a credit report distributed to merchants. The Court employed the test of content, form and context, best articulated in *Connick v. Myers*, 461 U.S. 138, 148–49, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983), to analyze whether the credit report was a matter of "public concern." Speech on matters of "private concern," the Court found, while not wholly unprotected, is not as substantial relative to important state interests. Thus, the credit report was prepared solely for the individual interest of the speaker and a specific business, it was false and clearly damaging, and, like advertising, it represents a form of speech unlikely to be deterred by incidental state regulation: The credit report involved a matter of "private concern."

Measured by this standard, both *Hustler* in general and "Orgasm of Death" in particular deserve limited only first amendment protection. *Hustler* is a profitable commercial enterprise trading on its prurient appeal to a small portion of the population. It deliberately borders on technical obscenity, which would be wholly unprotected, to achieve its purposes, and its appeal is not based on cognitive or intellectual appreciation.[12] Because of the solely commercial and pandering nature of the magazine, neither *Hustler* nor any other pornographic publication is likely to be deterred by incidental state regulation. No sensitive first amendment genius is required to see that, as the Court concluded in *Dun & Bradstreet*, "[t]here is simply no credible argument that this type of [speech] requires special protection to insure that 'debate on public issues [will] be uninhibited, robust, and wide-open.'" 472 U.S. at 762, 105 S.Ct. at 2947, (quoting *New York Times*

---

12. In *FCC v. Pacifica Foundation*, the Court's opinion states that patently offensive references to excretory and sexual organs and activities, while to some extent protected, "surely lie at the periphery of First Amendment concern." 438 U.S. at 743, 98 S.Ct. at 3037.

*Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1967)).

To place *Hustler* effectively on a par with *Dun & Bradstreet*'s "private speech" or with commercial speech,[13] for purposes of permitting tort lawsuits against it hardly portends the end of participatory democracy, as some might contend. First, any given issue of Hustler may be found legally obscene and therefore entitled to no first amendment protection. Second, tort liability would result after-the-fact, not as a prior restraint, and would be based on harm directly caused by the publication in issue. *See NAACP v. Claiborne Hardware Co.,* 458 U.S. at 917–919, 102 S.Ct. at 3427–28. Third, to the extent any chilling effect existed from the exposure to tort liability, this would, in my view, protect society from loss of life and limb, a legitimate, indeed compelling, state interest. Fourth, obscenity has been widely regulated by prior restraints for over a century. Before *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), there was no *Hustler* magazine and it would probably have been banned. Despite such regulation, it does not appear that the pre-*Roth* era was a political dark age. Conversely, increasing leniency on pornography in the past three decades has allowed pornography to flourish, but it does not seem to have corresponded with an increased quality of debate on "public" issues. These observations imply that pornography bears little connection to the core values of the first amendment and that political democracy has endured previously in the face of "majoritarian notions of social propriety."

Rendering accountable the more vicious excesses of pornography[14] by allowing damage recovery for tort victims imposes on its purveyors a responsibility which is insurable, much like a manufacturer's responsibility to warn against careless use of its products. A tort remedy which compensates death or abuse of youthful victims clearly caused by a specific pornographic publication would be unlikely to "chill" the pornography industry any more than unfavorable zoning ordinances[15] or the threat of obscenity prosecution[16] has done. The reasonableness of allowing a tort remedy in cases like this is reinforced by the fact that only one lawsuit was filed in regard to "Orgasm of Death." The analogy with regulations on commercial speech is not inappropriate: pornography should assume a lower value on the scale of constitutional protection; and the state regulation by means of tort recovery for injury directly caused by pornography is appropriate when tailored to specific harm and not broader than necessary to accomplish its purpose. *See Central Hudson,* 447 U.S. at 566, 100 S.Ct. at 2351.

The foregoing analysis immediately differentiates this case from *Brandenburg v. Ohio,*[17] which addressed prior restraints on public advocacy of controversial political ideas. Placing *Hustler* on the same analytical plane with *Brandenburg* represents an unwarranted extension of that holding, which, unlike *Dun & Bradstreet* and the commercial speech cases, rests in the core values protected by the first amendment. Even *Brandenburg,* how-

---

**13.** *Compare Central Hudson Gas & Electric Corp. v. Public Service Commission of New York,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).

**14.** See, for example, the Meese Commission Report, whose research samples included 2,325 magazine titles, 725 book titles, and 2,370 film titles. *Commission Report, supra* n. 9, Vol. II at 1504. While more graphic titles are cited, the following is a list of the more shocking pornographic publication titles: *Animal Action, Incest Mommy, Island of Incest, I Want All Night Abuse, Knocked up Black Mama, Nazi Sex Slave, Nympho Mother's Incest Obsession, Pregnant Dildo Bondage, Pregnant Lesbians, Slave Exchange, Teenage Tramp, Transvestites Getting Together,*

*Teen Rape Orgy, The Nuns Animal Fun, Unwilling Sex Slave.*

**15.** *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986).

**16.** The production, distribution, and retail sale of pornographic materials has become a multi-billion dollar industry in the United States. *See Commission Report, supra* n. 9, Vol. II, ch. 8. Current laws and their enforcement apparently have little deterrent effect on this blossoming industry. *Id.,* Vol. I at 366–72.

**17.** 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969).

ever, recognized that the state's regulatory interest legitimately extends to protecting the lives of its citizens from violence induced by speech. Moreover, *Brandenburg* is intertwined with the context of the speech as well as its content—advocacy of inciteful ideas would thus be differently regarded in a collection of speeches by Tom Paine than it is among a crowd of armed vigilantes who proceed to riot. The *Brandenburg* test, implicitly rejected by the majority, is simply inappropriate to define the limits of constitutional protection afforded in this case.[18] Viewed in the overall context of first amendment jurisprudence, moreover, *Brandenburg* does not exclude the possibility of state regulation.

Eliminating the *Brandenburg* incitement theory as a basis for recovery would have been sufficient to reverse the jury award here. The majority go much further, however, and afford *Hustler* virtually complete protection from tort liability under the first amendment. I vigorously oppose their unnecessary elaboration on first amendment law, which, I believe, will undercut the ability of the states to protect their youth against a reckless and sometimes dangerous business which masquerades as a beneficiary of the first amendment.

## III.

Texas courts have never been called upon to assess a claim like this one. Since there is no cross-appeal, we should not speculate on the precise nature of the theory of liability a Texas court might accept, although negligence and attractive nuisance seem theoretically appropriate.[19] Texas law supplies no reason to conclude, as the district court did, that *Brandenburg v. Ohio*, representing a federal constitutional limitation on a state's restraints on speech, could be turned into an affirmative theory of tort law. I believe this use of *Brandenburg* is wrong, insofar as it suggests that federal constitutional law rather than state law governs the first issue in this case, which is the nature of the tort committed by Hustler.

18. *Compare* Comment, "Tort Liability for Non-libelous Negligent Statements: First Amendment Considerations," 93 Yale L.J. 744 (1984) (advocating liability on a negligence standard defined by reference to *Brandenburg* ); with Comment, "Tort Liability of the Media for Audience Acts of Violence: A Constitutional Analysis," 52 S.Cal.L.Rev. 529 (1979) (similar standard to Yale Law Journal).

19. In *Weirum v. RKO,* 15 Cal.3d 40, 123 Cal. Rptr. 468, 539 P.2d 36 (1975), the Supreme Court of California held a radio station liable for broadcasting a promotional event which caused the teenage listeners to participate in a high-speed chase in the Los Angeles freeways killing a motorist. There was a direct connec-

tion between the station's broadcast and the fatal accident. In *Hyde v. Missouri,* 637 S.W.2d 251 (Mo.Ct.App.1982) the court held a newspaper and other defendants liable for publishing the name of a victim of a sexual assault while her attacker was still at large. The causal connection between the published information and the attacker's continued threats to the victim was again straightforward. Other courts have rejected damage claims based on tenuous facts, *Zamora v. Columbia Broadcasting System,* 480 F.Supp. 199 (S.D.Fla.1979), or first amendment analysis with which I differ. *DeFilippo v. National Broadcasting Co.,* 446 A.2d 1036 (R.I. 1982); *Olivia N. v. National Broadcasting Co.,* 126 Cal.App.3d 488, 178 Cal.Rptr. 888 (1981).