**Shirley DeFILIPPO et al.**

v.

**NATIONAL BROADCASTING CO., INC. et al.**

**No. 80–318–Appeal.**

Supreme Court of Rhode Island.

June 15, 1982.

Thomas W. Pearlman, Morton J. Marks, William A. Gosz, Providence, for plaintiffs.

Edwards & Angell, Knight Edwards, Providence, Coudert Brothers, Carleton G. Eldridge, Jr., June A. Eichbaum, New York City, for defendants.

OPINION

MURRAY, Justice.

This is an unusual and tragic case in which this court is being called upon to fashion a rule of great social import. The issue raised herein is one of first impression in this jurisdiction. The plaintiffs, Shirley and Nicholas DeFilippo, Sr., brought suit pursuant to G.L. 1956 (1969 Reenactment) §§ 10–7–1 through 10–7–13. (Wrongful Death Act) in their roles as co-administrators of the estate of Nicholas DeFilippo, Jr. (Nicky), their thirteen-year-old son, as individuals, and as Nicky's parents. The defendants are the National Broadcasting Co., Inc. (NBC); the Outlet Co., which is the owner-operator of WJAR-TV, the NBC affiliate in Providence; and ten "John Doe" defendants who were not served and have not appeared in this action.[1]

The plaintiffs' claims arise from a broadcast on defendants' television network of "The Tonight Show" on May 23, 1979. "The Tonight Show" is a popular comedy and talk show hosted by Johnny Carson. It is broadcast at 11:30 p. m. in the eastern time zone and is carried locally by WJAR–TV. On the broadcast of May 23, 1979, one of Johnny Carson's guests was Dar Robinson, a professional stuntman. While introducing him, Carson announced that Robinson would "hang" Carson as a stunt later in the broadcast.

Carson and Robinson conversed for a few moments, and photographs and a film clip were shown in which Robinson performed dangerous stunts. Carson then announced that when the program resumed after a commercial break, he would attempt a stunt that involved dropping through a trapdoor with a noose around his neck.

At this point, Robinson said "[b]elieve me, it's not something that you want to go and try. This is a stunt * * *." Thereupon, the audience began to laugh. The following colloquy then took place between Robinson and Carson:

---

1. The "John Doe" defendants were the commercial sponsors of the broadcast at issue, and at present their names are unknown to plaintiffs.

"Robinson: I've got to laugh—you know, you're all laughing * * *.

"Carson: Explain that to me.

"Robinson: I've seen people try things like this. I really have. I happen to know somebody who did something similar to it, just fooling around, and almost broke his neck * * *."

The program then broke for a commercial.

When the show resumed, Carson was shown standing on a gallows with a noose hanging by his side while Robinson and a third man, "the hangman," stood by. A comic dialogue ensued between Carson and Robinson. A hood was then placed over Carson's head and the noose put on over the hood. The trapdoor was opened, and Carson fell through. To the delight of the audience, he survived the stunt without injury.

The plaintiffs claim that their son, Nicky, regularly watched "The Tonight Show," and they allege that he viewed this particular broadcast. Several hours after the broadcast, the DeFilippos found Nicky hanging from a noose in front of the television set, which was still on and tuned to WJAR–TV.

On October 22, 1979, plaintiffs filed a complaint in the Superior Court. They alleged that Nicky had watched the stunt and then tried to imitate it, thereby accidentally hanging himself. They proposed two theories of recovery. The first was that defendants were negligent in permitting the stunt to be broadcast and that they "negligently failed to adequately warn and inform infant plaintiff * * * of the dangers of this program." The second theory upon which plaintiffs sought to recover was that the broadcast had been intentionally shown with malicious and reckless disregard of plaintiffs' and Nicky's welfare and that defendants "placed their financial interests above those of the plaintiffs and the deceased minor."

Thereafter, on February 15, 1980, defendants filed a motion to dismiss or, in the alternative, for summary judgment.[2] The motion was heard by a justice of the Superior Court on March 25, 1980. On April 10, 1980, plaintiffs filed an amended complaint in which they further clarified their original two theories of recovery by raising four causes of action: negligence; failure to warn; and two novel theories—products liability and intentional tort-trespass. They continued to demand damages in the amount of $10,000,000.

On June 4, 1980, the Superior Court rendered a written decision granting defendants' motion for summary judgment. The trial justice first rejected plaintiffs' product-liability claim, holding that defendants' broadcast was not a product. The trial justice then held as a matter of law that the First Amendment to the United States Constitution barred relief to the DeFilippos. He found that to permit recovery "would create a chilling effect on the first amendment rights of others * * *." On June 9, 1980, judgment was entered for defendants, from which order plaintiffs now appeal.

On appeal, plaintiffs have argued that the First Amendment does not bar recovery and that, therefore, triable issues of fact remain on their theories of negligence and products liability. The plaintiffs have also asked us to overturn the trial justice's finding that the broadcast was not a product. We hold that the First Amendment does indeed bar recovery in such actions; therefore, we do not reach plaintiffs' other contentions.

## I

We begin our analysis by noting that it is well-settled law that the First Amendment applies to the states through the Fourteenth Amendment. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 599 n.2, 100 S.Ct. 2814, 2840 n.2, 65 L.Ed.2d 973, 1004 n.2 (1980) (Stewart, J., concurring);

**2.** The motion was styled in this manner because affidavits were attached to the pleadings. *See Palazzo v. Big G Supermarkets, Inc.*, 110 R.I. 242, 292 A.2d 235 (1972); Super.R.Civ.P. 12(b) and 56. The Superior Court considered the motion to be one for summary judgment in accordance with this authority.

*Consolidated Edison Co. v. Public Service Commission*, 447 U.S. 530, 534, 100 S.Ct. 2326, 2331, 65 L.Ed.2d 319, 325–26 (1980); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 500 n.8, 72 S.Ct. 777, 780 n.8, 96 L.Ed. 1098, 1105 n.8 (1952); *Gitlow v. New York*, 268 U.S. 652, 666, 45 S.Ct. 625, 630, 69 L.Ed. 1138, 1145 (1925); *id.* at 672–73, 45 S.Ct. at 632, 69 L.Ed. at 1148 (Holmes, J., dissenting).[3] The First Amendment freedom of speech is not absolute, although it "forbid[s] the States to punish the use of words or language not within 'narrowly limited classes of speech.' " [Citation omitted.] *Gooding v. Wilson*, 405 U.S. 518, 521–22, 92 S.Ct. 1103, 1106, 31 L.Ed.2d 408, 414 (1972).

■ Those classes of speech which states may proscribe within First Amendment guidelines are obscenity, *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419, *reh. denied*, 414 U.S. 881, 94 S.Ct. 26, 38 L.Ed.2d 128 (1973); *Roth v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); "fighting words," *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); defamatory invasions of privacy, *Beauharnais v. Illinois*, 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919, *reh. denied*, 343 U.S. 988, 72 S.Ct. 1070, 96 L.Ed. 1375 (1952); and words likely to produce imminent lawless action (incitement), *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (per curiam). *See Hess v. Indiana*, 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973) (per curiam); *Gooding v. Wilson, supra.*[4]

■ In cases like the one at bar, claims must be weighed against two distinct First Amendment rights that come into play. The more obvious of these is the First Amendment right of the broadcasters. *See Columbia Broadcasting System v. Democratic National Committee*, 412 U.S. 94, 93

S.Ct. 2080, 36 L.Ed.2d 772 (1973). This protection must afford defendants a strong presumption in their favor, a presumption that extends to both entertainment and news. *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 578, 97 S.Ct. 2849, 2859, 53 L.Ed.2d 965, 978 (1977). The First Amendment, however, does not provide the broadcast media with unabridgable rights, as is evidenced by the limited governmental control over the broadcast media. *See Federal Communications Commission v. Pacifica Foundation*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073, *reh. denied*, 439 U.S. 883, 99 S.Ct. 227, 58 L.Ed.2d 198 (1978); *Red Lion Broadcasting Co. v. Federal Communications Commission*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).

■ The other set of First Amendment rights belongs to the viewers and general public, whose rights are paramount and supersede those of the broadcasters. *Columbia Broadcasting System v. Democratic National Committee*, 412 U.S. at 102, 93 S.Ct. at 2086, 36 L.Ed.2d at 783. The public has a right to suitable access to "social, esthetic, moral, and other ideas and experiences * * *." *Id.; Red Lion Broadcasting Co. v. Federal Communications Commission*, 395 U.S. at 390, 89 S.Ct. at 1807, 23 L.Ed.2d at 389. We must seek to balance these two distinct First Amendment protections with the arguments advanced by plaintiffs. Using this balancing test, we find that plaintiffs cannot overcome the right to freedom of expression guaranteed by the First Amendment.

## II

The plaintiffs rely in large measure on *Weirum v. RKO General, Inc.*, 15 Cal.3d 40, 123 Cal.Rptr. 468, 539 P.2d 36 (1975), in arguing that the First Amendment does not

---

3. The imposition of tort liability constitutes state action that implicates the First and Fourteenth Amendments. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 265, 84 S.Ct. 710, 718, 11 L.Ed.2d 686, 697 (1964).

4. The parameters and protections of the First Amendment are impossible to define precisely. Occasionally, the state may have an interest

that outweighs certain First Amendment considerations. For example, this court recently upheld the constitutionality of Rhode Island's Family Court shield law, G.L. 1956 (1981 Reenactment) § 14–1–30, from a claim that it violated the First Amendment. *See Edward A. Sherman Publishing Co. v. Goldberg*, R.I., 443 A.2d 1252 (1982).

bar recovery. In *Weirum*, the California Supreme Court held that a radio station could be liable for the deaths of two motorists who were killed in an automobile accident with two teenagers who were participating in the station's promotional contest.[5] The court held that there was no First Amendment bar to the radio station's liability "for the foreseeable results of a broadcast which created an undue risk of harm * * *. The First Amendment does not sanction the infliction of physical injury merely because achieved by word, rather than act." *Id.* at 48, 123 Cal.Rptr. at 472, 539 P.2d at 40. The plaintiffs maintain that the broadcast media should be liable for the foreseeable results of their actions and that under the doctrine of *Weirum*, the issue of foreseeability is one of fact for a jury to determine.

The plaintiffs also refer us to *Olivia N. v. National Broadcasting Co.*, 74 Cal.App.3d 383, 141 Cal.Rptr. 511 (1977), in support of their claim that the First Amendment does not bar recovery in this case. In *Olivia N.*, the plaintiff had been sexually assaulted by four other girls in a manner similar to one that had been depicted in a television show on the defendant's network. The trial justice granted judgment to the broadcaster before a jury was impaneled on the ground that the program was not an "incitement" to the attackers. The California Court of Appeals, relying in part on *Weirum, supra*, reversed the dismissal and remanded the case for trial so that a jury could determine whether the broadcast had "resulted in actionable injuries" despite the First Amendment. *Olivia N. v. National Broadcasting Co.*, 74 Cal.App.3d at 390, 141 Cal.Rptr. at 514. The California Supreme Court refused to hear the broadcaster's appeal, and Justice Rehnquist, acting as circuit justice, refused to stay commencement of the trial. *National Broadcasting Co. v. Niemi*, 434 U.S. 1354, 98 S.Ct. 705, 54 L.Ed.2d 742, *cert. denied*, 435 U.S. 1000, 98 S.Ct. 1657, 56 L.Ed.2d 91 (1978).

The more recent proceedings in *Olivia N.*, however, do not support the DeFilippos' claim. *Olivia N.* proceeded to trial, and the plaintiff's counsel admitted in his opening statement to the jury that he could not prove incitement but would prove negligence instead. The California Superior Court thereafter granted the defendants' motion for nonsuit on the ground that, as a matter of law, the plaintiff could not prove the required element of incitement as mandated by *Olivia N. v. National Broadcasting Co., supra*. This decision was affirmed by the California Court of Appeals, *Olivia N. v. National Broadcasting Co.*, 126 Cal.App.3d 488, 178 Cal.Rptr. 888 (1981); and the Supreme Court of California again refused to hear an appeal. (February 3, 1982).

### III

Having outlined the general First Amendment principles that must guide our analysis and plaintiffs' contentions, we now set forth the reasons for our decision.

Of the four classes of speech which may legitimately be proscribed, it is obvious that the only one under which plaintiffs can maintain this action is incitement to immediate harmful conduct under *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). *See Carey v. Population Services International*, 431 U.S. 678, 701, 97 S.Ct. 2010, 2024, 52 L.Ed.2d 675, 695 (1977); *Kingsley Pictures Corp. v. Regents of the University of the State of New York*, 360 U.S. 684, 688, 79 S.Ct. 1362, 1365, 3 L.Ed.2d 1512, 1516 (1959); *Mitchell Family Planning Inc. v. City of Royal Oak*, 335 F.Supp. 738, 742–43 (E.D.Mich.1972); *Olivia N. v. National Broadcasting Co.*, 126 Cal. App.3d 488, 493, 178 Cal.Rptr. 888, 892 (1981). *See also Whitney v. California*, 274 U.S. 357, 376, 47 S.Ct. 641, 648, 71 L.Ed. 1095, 1107 (1927) (Brandeis, J., concurring).

---

**5.** In *Weirum v. RKO General, Inc.*, 15 Cal.3d 40, 123 Cal.Rptr. 468, 539 P.2d 36 (1975), the defendant's radio station had sponsored a contest to reward the first listener who located one of the station's disk jockeys who was driving around the Los Angeles area broadcasting clues to his whereabouts. The teenagers, in their haste to locate the disk jockey, forced a car off the road killing its occupants. The victims' heirs then sued the radio station.

The trial justice, relying on *Olivia N.*, 74 Cal.App.3d at 389, 141 Cal.Rptr. at 514, found that "the question of whether a broadcast falls within any category of unprotected speech is a question of law, if the material facts are not in dispute." We agree with this holding.[6] The trial justice then held that as a matter of law the broadcast "contain[ed] no incitement * * *."

This decision finds support not only in the more recent proceedings in *Olivia N.*, *supra*, but also in *Zamora v. Columbia Broadcasting System*, 480 F.Supp. 199 (S.D. Fla.1979). In *Zamora* the plaintiff, after having been convicted of murder, sued the three commercial television networks "for failing to use ordinary care to prevent [plaintiff] from being 'impermissibly stimulated, incited and instigated' to duplicate the atrocities he viewed on television." *Id.* at 200. The District Court found that the First Amendment barred the suit, and it dismissed the complaint. The plaintiffs maintain that the holding in *Zamora* is inapposite because there the plaintiff was not referring to one specific incident but to television broadcasting in general. While plaintiffs are correct in pointing out the differences between *Zamora* and the instant case, we do not accept their characterization of that case as inapposite. In both cases the plaintiffs tried to establish negligence and recklessness by the broadcasters. We are therefore persuaded by the District Court's holding that the First Amendment bars this type of suit.

The main problem in permitting relief to the DeFilippos is that incitement cannot be measured precisely, and this difficulty lies at the core of our holding. Nicky was, as far as we are aware, the only person who is alleged to have emulated the action portrayed in the "hanging" on the May 23, 1979 broadcast of "The Johnny Carson Show." In such a case, we cannot say that the broadcast constituted an incitement. Indeed, Robinson stressed the dangers of performing the stunt, saying, "it's not something that you want to go and try."[7] It appears that despite these warnings, Nicky felt encouraged to emulate the stunt; because of these warnings, however, others may have avoided attempting to duplicate the stunt. To permit plaintiffs to recover on the basis of one minor's actions would invariably lead to self-censorship by broadcasters in order to remove any matter that may be emulated and lead to a law suit.[8]

This self-censorship would not only violate defendants' limited right to make their own programming decisions, *Writers Guild of America, West, Inc. v. Federal Communications Commission*, 423 F.Supp. 1064, 1154 (C.D.Cal.1976), *vacated sub nom., Writers Guild of America v. American Broadcasting Co.*, 609 F.2d 355 (9th Cir. 1979), but would also violate the paramount rights of the

---

6. In constitutional adjudication, particularly in respect to matters affecting the First Amendment, it is frequently necessary for courts, including the Supreme Court of the United States, to enter the fact-finding area. *See Pennekamp v. Florida*, 328 U.S. 331, 335, 66 S.Ct. 1029, 1031, 90 L.Ed. 1295, 1297–98 (1946). As the Court stated in *Rosenbloom v. Metromedia*, 403 U.S. 29, 54, 91 S.Ct. 1811, 1825, 29 L.Ed.2d 296, 318 (1971): "[T]his Court has an 'obligation to test challenged judgments against the guarantees of the First and Fourteenth Amendments,' and in doing so 'this Court cannot avoid making an independent constitutional judgment on the facts of the case.'" [Citation omitted.] As a consequence, trial justices and state appellate courts must draw independent conclusions upon issues of constitutional fact. This duty may be performed upon a motion for summary judgment where, as here, there is no genuine issue of material fact on the question of incitement.

7. On the basis of Robinson's warnings, the trial justice distinguished this case from *Weirum v. RKO General, Inc.*, *supra*, in which there was explicit incitement. We have viewed a video tape of Robinson's segment on "The Johnny Carson Show," and we agree that *Weirum* is inapposite to the case at bar. Therefore, our analysis herein applies only to the facts of the instant case and not to situations in which there was explicit incitement.

8. As the Supreme Court has acknowledged, fear of the expense of defending defamation suits also spurs self-censorship. *See Rosenbloom v. Metromedia*, 403 U.S. 29, 52–53, 91 S.Ct. 1811, 1824, 29 L.Ed.2d 296, 317 (1971). *See also New York Times Co. v. Sullivan*, 376 U.S. 254, 279, 84 S.Ct. 710, 725, 11 L.Ed.2d 686, 706 (1964).

viewers to suitable access to "social, esthetic, moral, and other ideas and experiences * * *." *Columbia Broadcasting System v. Democratic National Committee*, 412 U.S. 94, 102, 93 S.Ct. 2080, 2086, 36 L.Ed.2d 772, 783 (1973).

Under the facts of this case, we see no basis for a finding that the broadcast in any way could be construed as incitement. Consequently, the exception set forth in *Brandenburg v. Ohio, supra*, is inapplicable to the case at bar. In any event, the incitement exception must be applied with extreme care since the criteria underlying its application are vague. Further, allowing recovery under such an exception would inevitably lead to self-censorship on the part of broadcasters, thus depriving both broadcasters and viewers of freedom and choice, for "above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter or its content." *Police Department of Chicago v. Mosley*, 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212, 216 (1972).

On the bases of the criteria set forth and of our analysis of this case, we find that the awarding of summary judgment to the defendants was proper. The plaintiffs' appeal is denied and dismissed, the judgment appealed from is affirmed, and the case is remanded to the Superior Court.

BEVILACQUA, C. J., did not participate.