## Smith v. Linn

*Thomas B. Rutter*, for plaintiff.
*Albert B. Gerber*, for defendant Lyle Stuart Inc.

VOGEL, *P.J.*, September 30, 1988—Plaintiff David H. Smith, individually and in his capacity as administrator of the estate of Patricia Smith, deceased, instituted suit against Lyle Stuart Inc., and several other defendants not relevant herein, seeking to recover damages for the death of plaintiff's decedent. The suit against Lyle Stuart alleges that Lyle Stuart should be held at least partially liable as the publisher of a book titled *The Last Chance Diet ... when everything else has failed,* which plaintiff alleges contained misinformation that eventually led to decedent's death.

The gravaman of plaintiff's causes of action against Lyle Stuart sound in negligence, conscious and negligent misrepresentation, strict products liability, breach of warranty and the intentional inflic-

tion of emotional distress. This opinion shall discuss each of them seriatim.

## PROCEDURAL HISTORY

Although the procedural history in this case is somewhat confusing, it appears to have been commenced by complaint under the Health Care Services Malpractice Act as a medical malpractice arbitration suit. By order of April 11, 1979, administrator Arthur S. Frankston, Esquire, transferred the claims against Lyle Stuart and Robert Linn, D.O., to this court. The record was certified to this court on June 6, 1979. Also named as defendants in this action were, as just mentioned, Robert Linn, D.O., the book's author, Howard Rosenfeld, M.D., the decedent's personal physician, and numerous companies allegedly involved in the production and sale of the pre-digested liquid protein mix ingested by decedent. Lyle Stuart remains the only defendant in this case, the suits against all other named defendants having been settled or dismissed.

On January 13, 1988, Lyle Stuart filed the motion for summary judgment now under consideration. Oral argument on the motion was heard before the Honorable William W. Vogel, P.J., and the Honorable S. Gerald Corso, en banc, on March 21, 1988. Per this opinion and attached order. The motion for summary judgment against plaintiff will be granted based upon the following discussion.

## FACTUAL BACKGROUND

Lyle Stuart initially met Robert Linn, D.O., in 1975 after Lyle Stuart read a magazine article about Dr. Linn's liquid protein dietary program. Lyle Stuart used the diet to lose weight. Lyle Stuart, an experienced publisher, suggested to Dr. Linn that

they do a book about the diet. An agreement was reached for Dr. Linn to author, and Lyle Stuart to publish, the book in March 1976. The book was to be geared to the general public, as opposed to a medical type text.

When the book had gone to galley proofs, Lyle Stuart, president of Lyle Stuart Inc., approached Dr. George Blackburn of Harvard Medical School, a leading researcher in the field of nutrition to review the book. Blackburn and Lyle Stuart met in June of 1976 to discuss Blackburn's review of the book. Plaintiff contends that Blackburn's proposals were not incorporated by Lyle Stuart into the book. Defendant contends any proposed changes were either made, if they were important, or they were essentially semantic in nature. The book was eventually published in a form essentially similar to the galley proof reviewed by Dr. Blackburn.

Patricia Smith purchased a copy of *The Last Chance Diet* in January of 1977. She followed the diet under the care of her physician, Howard Rosenfeld, M.D. She had lost over 100 pounds in June of 1977 when she died from cardiac failure that plaintiff alleges was caused by decedent's following the diet.

## DISCUSSION

Plaintiff's wrongful death and survival actions are based on five independent theories of recovery. We shall first address plaintiff's claims based on theories of negligent publication and conscious and negligent misrepresentation, then consider plaintiff's strict product's liability and breach of warranty allegations, and finally we will discuss plaintiff's claim for the intentional infliction of emotional distress.

The standard for granting summary judgment in Pennsylvania is set forth in Pa.R.C.P. 1035(b),

which reads in part as follows: "The judgment sought shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Pa.R.C.P. 1035(b), 42 Pa. C.S. As stated by the Superior Court:

"This severe disposition should only be granted in cases where the right is clear and free from doubt. To determine the absence of a genuine issue of fact, the court must take the view of the evidence most favorable to the non-moving party, and any doubts must be resolved against the entry of the judgment." *Day v. Volkswagenwerk Aktiengesellschaft,* 318 Pa. Super. 225, 231, 464 A.2d 1313, 1316 (1983), quoting *Acker v. Palena,* 260 Pa. Super. 214, 218-19, 393 A.2d 1230, 1232 (1978). Finally, the burden of demonstrating that no genuine issue of material fact exists and that the moving party deserves judgment as a matter of law rests on the moving party, defendant Lyle Stuart. *Acker* at 218-19, 393 A.2d at 1232.

At the outset, it must be noted that this court found no reported Pennsylvania cases resolving the issues surrounding negligent publication, and conscious and negligent misrepresentation at it applies to publishers. Thus, this case presents itself as one of first impression.

A review of the applicable law reveals no cases that have directly held publishers liable based on the content of a publication. The cases contrary to holding publishers liable are legion.

As far back as 1921 in *Jaillet v. Cashman,* 115 Misc. 383 (1921), 189 N.Y.S. 743 (1921), aff'd, 202 A.D. 805, 194 N.Y.S. 947 (1922), aff'd, 235 N.Y. 511, 139 N.E. 714 (1923), courts have been shown

an unwillingness to hold publishers liable for the contents of a publication. *Jaillet* involved a stockowner who brought suit against an unincorporated association that supplied its subscribers with news via a ticker service. The court held that no cause of action existed absent a breach of contract. obligation or trust or a deceit, libel or slander. *Jaillet* at 384, 189 N.Y.S. at 744. In *Courteen Seed Co. v. Hong Kong & Shanghai Banking Corp.*, 245 N.Y. 377, 157 N.E. 272 (1927) reh'g. denied, 246 N.Y. 534, .159 N.E. 641 (1927), the court stated that "negligent words are not actionable unless they are uttered directly, with knowledge or notice that they will be acted on, to one to whom the speaker is bound by some relation of duty, arising out of public calling, contract or otherwise, to act with care if he acts at all." *Courteen* at 381, 157 N.E. at 273. We point out *Courteen* did not involve publishers and related First Amendment concerns in holding that no liability existed where the defendant had supplied misinformation to a third party. In a case involving a newspaper publisher's liability, *Macknown v. Illinios Publishing and Printing Co.*, 289 Ill. App. 59, 6 N.E. 2d 526 (1937), the appellate court of Illinois upheld dismissal of plaintiff's suit against the newspaper over an article recommending a dandruff cure that plaintiff followed and allegedly received injuries from. The court cited *Jaillet* in stating that absent contract, fiduciary relationship between the parties or an intentional misstatement, there can be no liability, *Mackown* at 67, 6 N.E. 2d at 529-30.

More recent cases have continued to deflect the fear of untold dollars of liability faced by publishers of controversial or even disputed matters. However, the legal reasoning behind the decisions has undergone some alteration. Such was the case in

*Yuhas v. Mudge,* 129 N.J. Super. 207, 322 A.2d 824 (1974), where *Popular Mechanics* magazine was sued for personal injuries sustained from fireworks purchased in response to an advertisement appearing in the magazine. Plaintiffs argued that since *Popular Mechanics* had "an aura of authentativeness" in the public's mind, the magazine owed the public "the duty to investigate and test inherently dangerous products advertised in their publication." *Yuhas* at 209, 322 A.2d at 825. The court granted *Popular Mechanics'* motion for summary judgment, refusing to impose such a legal duty on the publisher absent the publisher's warranting, guaranteeing or endorsing the product. To impose such a legal duty on publishers, stated the court, would have a "staggering adverse effect on the commercial world and our economic system." *Yuhas* at 209, 210, 322 A.2d at 825.

In *Kercsmar v. Pen Argyl School District,* 1 D.&C. 3d 1 (1976), the only Pennsylvania case on publisher's liability, the Northampton County Court of Common Pleas denied the preliminary objections of the authors of a high school chemistry book to jurisdiction. The author's defense that the First Amendment prevented jurisdiction from attaching under the Pennsylvania long-arm statute did not persuade the court. Further, the *Kercsmar* court denied the publisher's preliminary objection in the nature of a demurrer to plaintiff's negligence claim. *Kercsmar* provides little help in deciding this case since it deals with preliminary objections, settled before progressing further, and is not binding authority on this court.

A more persuasive argument against imposing liability on publishers is found in *Cardozo v. True,* 342 So.2d 1053 (Fla. Dist. Ct. App. 1977), cert denied, 353 So.2d 674 (1977). The suit was against

the seller of a cookbook that contained a recipe using ingredients from the Dasheen plant, called "Elephant's Ears." Plaintiff alleges she ate a small slice of the roots while preparing the recipe and "immediately experienced a burning of the lips, mouth, throat and tongue, coughing and gasping, and intense stomach cramps." *Id.* at 1054. The complaint alleged the book contained inadequate instructions and failed to warn of the dangers of uncooked Dasheen roots. It further alleged that defendant breached the U.C.C. implied warranties of merchantability. The court cited to *Yuhas* and *Mackown* in denying plaintiff's claim against the bookseller. "[I]t is interesting to note that even publishers have not been held liable where injuries have occurred through use of products used in their magazines." *Cardozo* at 1056. It further noted that "[t]he principles of law and considerations of public policy which support denial of liability of a publisher in these instances more urgently mandates denial of liability of a newsdealer." *Id.* at 1056. The root of the *Cardozo* decision was that "ideas hold a privileged position in our society. They are not the equivalent to commercial products." *Id.* at 1057.

A similar finding in favor of the publisher was obtained in *Herceg v. Hustler Magazine Inc.*, 565 F.Supp. 802 (S.D. Tex. 1983). The U. S. District Court for the Southern District of Texas decided claims brought against Hustler in tort and under the wrongful death statute on theories of strict liability and negligent publication. Hustler had printed a magazine article titled "Orgasm of Death" that discussed "autoerotic asphyxiation" (masturbation while hanging) which caused the death of plaintiff's son and brother. The court held the First Amendment barred suit against a publisher absent allegations that the article fell within an unprotected class

of speech, namely, defamation, fighting words, incitement to immediate harmful conduct or obscenity. *Id.* at 804. "Negligent" publication, the court pointed out, is a cause of action which arose in defamation cases. *Id.* at 803. The court found no duty existed on a publisher with respect to the content of its publication outside the area of defamation. Thus, since plaintiffs did not claim the speech fell into an unprotected class of speech, no cause of action against Hustler existed.

Plaintiffs amended their complaint to include an incitement claim.[1] The Fifth Circuit reversed a jury verdict in plaintiff's favor on that claim. *Herceg v. Hustler,* 814 F.2d 1017 (5th Cir. 1987). The Fifth Circuit pointed out that "some types of speech are excluded from, or entitled to narrowed constitutional protection. Freedom of speech does not protect obscene material, child pornography, fighting words, incitement to imminent lawless activity and purposefully-made or recklessly-made false statements of fact such as libel, defamation, or fraud." *Id.* at 1020.

Numerous other cases have placed equal importance on First Amendment free speech concerns. In *Demuth Development Corp. v. Merck & Co. Inc.,* 432 F.Supp. 990 (1977), plaintiff sued the publisher of the "Merck Index," which contained information about drugs, chemicals and biologicals including their toxicity. The index misrepresented a drug used in plaintiff's product as toxic, causing sales of that product to decrease. The court granted defendant's motion for summary judgment as to plaintiff's suit for "negligence and willful misrepresenta-

---

1. See *Herceg v. Hustler,* 583 F.Supp. 1566 (S.D. Tex. 1984) (denial of defendant's motion to dismiss or strike plaintiff's amended complaint).

tion," finding no duty owed to plaintiff by Merck. "Merck's right to publish free of fear of liability is guaranteed by the First Amendment, see *Gertz v. Robert Welch Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), and the overriding societal interest in the untrammeled dissemination of knowledge." *Merck* at 993.

Also on point is the case of *Alm. v. Van Nostrand Reinhold Co. Inc.* 134 Ill. App. 3d 716, 480 N.E. 2d 1263 (Ill. App. Ct. 1985). Defendant published a "how to" book called *The Making of Tools*. Plaintiff sued in negligence and relied on section 311 of the Restatement (Second) of Torts. The court reasoned that the publisher owed no duty to the reading public as to the contents of a publication authored by another. *Alm* at 720-1, 480 N.E. 2d at 1266. The plaintiff's invocation of section 311 of the Restatement (Second) of Torts was misplaced. The court refused to find it applied to publishers, stating "nothing in the comment or the illustrations suggests that the rule was intended to apply to publishers of information supplied by third parties, nor have plaintiffs cited any cases so applying the rule." *Alm* at 720, 480 N.E.2d at 126, 7.

Newspapers have not been held liable for false advertisements placed through their papers. *Pittman v. Dow Jones & Co. Inc.*, 662 F.Supp. 921 (E.D. La. 1987). Thus, even respecting commercial speech, the court found "no duty in tort exists for a newspaper publisher to investigate its advertisers for the correctness of the ads placed in the publication. . . ." *Id.* at 923.[2] Further, in *Gutter v. Dow Jones Inc.*, 22

2. For a case holding advertisements in a magazine actionable against the magazine publisher, see *Norwood v. Soldier of Fortune Magazine,* 651 F.Supp. 1397 (W.D.Ark. 1987), which in a memorandum opinion Chief Judge H. Franklin

Ohio St. 3d 286, 490 N.E.2d 898 (1986), the Ohio Supreme Court stated, in addition to recognizing the chilling effect on free speech imposing liability would have on publishers, that the plaintiff who relied on a false news article in choosing a securities investment could not recover even if he could prove reckless conduct because he was not one to whom the defendant newspaper owed any particular duty of care. *Id.* at 290, 490 N.E.2d at 901.

Analogously, suits against radio and television broadcasters for recovery in tort have met the same fate as suits against the print media. Thus, plaintiff's complaint was properly dismissed in *Zamora v. Columbia Broadcasting Systems*, 480 F.Supp. 199 (S.D. Fla. 1979), where suit was brought by a teenage boy who alleged 10 years of watching television violence in the programs of the three defendants caused him to shoot and kill his 83-year-old next-door neighbor. The court found the First Amendment, inter alia, prohibited suit and stated over plaintiff's arguments to the contrary "that the imposition of civil responsibility for damages would have an impact upon and indeed, act as a restraint on the defendants' exercise of their asserted First Amendment rights." *Zamora* at 203, citing *New York Times v. Sullivan*, 376 U.S. 254, 277, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Similarly holding is *Olivia v. National Broadcasting Co. Inc.*, 126 Cal. App. 3d 488 (1981), where a minor sued NBC after she was "artifically raped" by a group of juveniles imitating a scene in an NBC production. The court sustained defendant's non-suit as no allegations of incitement were made. Plaintiff's negligence and recklessness

Walters found a jury question existed over defendant's First Amendment argument on summary judgment where the magazine ran ads for professional killers, who were retained to dispose of plaintiff, but failed to do so.

claims against defendant were simply not actionable on First Amendment grounds.

In *DeFilippo v. National Broadcasting Co.*, 446 A.2d 1036 (R.I. Supreme Ct. 1982), a child had accidentally hung himself imitating a stunt seen on the Johnny Carson show. Plaintiff's theories were negligence in broadcasting the stunt and failure to adequately warn of the dangers involved. Also advanced by plaintiff was that the broadcast "had been intentionally shown with malicious and reckless disregard of plaintiff's and Nicky's welfare and that defendants 'placed their financial interests above those of the plaintiffs and the deceased minor.'" *DeFilippo* at 1038. Again, the First Amendment was held to bar plaintiff's suit. The court also held that incitement to immediate harmful conduct did not apply to the facts of the case. In accord, *Walt Disney Production v. Shannon*, 247 Ga. 402, 276 S.E.2d 580 (1981).

One case, *Weirum v. R.K.O.*, 15 Cal. 3d 40, 123 Cal. Rptr. 468, 539 P.2d 36 (1975), upheld liability upon a radio broadcaster. A radio station in Los Angeles ran a giveaway contest that awarded prizes for the first person to get to the location of a disc jockey broadcasting from a vehicle. Two cars attempting to arrive first forced a third car off the road, killing the driver. Despite defendant's First Amendment defense, a jury award for plaintiff was upheld since it was determined the radio station encouraged its listeners to act in a dangerous manner. Here, it was felt the foreseeability of danger was so great as to impose a duty of care on the broadcaster. The *Weirum* decision provides little help in resolving the case at hand as the opinion seems to suggest the radio station's activity constituted incitement, thus falling outside First Amendment protection. We include it for completeness.

The standard for granting summary judgment has been previously set forth. In accordance with Pa.R.C.P. 1035(b), we find no factual questions are presented and defendant Lyle Stuart is entitled to judgment as a matter of law as to plaintiff's claims based on negligent publication and conscious and negligent misrepresentation.

No precedent for plaintiff's causes of action exists in Pennsylvania case law. Looking beyond Pennsylvania law, this court concurs with the cases cited previously that hold a publisher of a newspaper or a book owed no duty to members of the public in general with respect to the contents of its publication, unless the speech at issue fell outside the scope of First Amendment protection. Clearly, *The Last Chance Diet* does not fall into any of the categories such as defamation, incitement, obscenity, fighting words or commercial speech which would lower the shield of First Amendment protection. The First Amendment protects more than pure political speech, it protects speech on matters of public interest including political speech, science, morality and the arts, to name a few.[3]

Plaintiff nevertheless contends that Lyle Stuart bears civil liability for his role in publishing *The Last Chance Diet* because it had knowledge the diet was dangerous. In support of this contention plaintiff notes that Lyle Stuart met with Dr. George Blackburn, M.D., that Dr. Blackburn informed Lyle Stuart that certain information contained in the

---

3. See *Rosenbloom v. Metromedia Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed. 296 (1971); *Roth v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council Inc.*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed. 2d 346 (1976).

book was misleading and dangerous, and that the book was published with knowledge that the risk of harm was foreseeable, thus creating civil liability for negligent publication and misrepresentation. Plaintiff would seek to employ the testimony of Sidney Bernstein, a publishing expert, to establish a standard of care for the publishing industry and breach of that standard. As such plaintiff argues that factual questions exist on which this case should proceed to trial. We disagree.

We have held that Lyle Stuart owed no duty to the members of the general public with respect to the contents of one of its publications. Thus, there is no cause of action against a publisher for negligent publication or misrepresentation under the facts as alleged and therefore no factual issues for a jury's determination.

The court's decision today rests squarely on the mandates of the First Amendment. The constitutional protection afforded to free speech is based on the idea that our society places utmost importance on the free flow and dissemination of ideas. While acknowledging that certain ideas may be dangerous, unpopular or even harmful, the benefits to society in allowing an uninhibited exchange of ideas, even unpopular ones, far outweigh the ills such ideas might bear. Our concern is over "the practical need to draw the line somewhere so that liability will not crush those upon whom it is put." *Herceg,* 565 F.Supp. at 803, quoting *Zamora v. Columbia Broadcasting System,* 480 F.Supp. 199, 201 (1979), citing Harper and James Law of Torts, Vol. 2 (1956), p. 1132, section 20.4. In practicality, allowing publishers to be sued for negligent publication and misrepresentation would open a Pandora's box for publisher's liability suits. The chilling effect of such a decision on free speech militates against the

imposition of liability in this case. Placing publishers in fear of civil liability of an untold magnitude for publishing controversial, dangerous or even potentially harmful ideas would stifle the publication, broadcast and exchange of all but the most simplistic material. The fear of liability would eventually chill to a trickle the free flow of information so cherished by our society and protected by our constitution.

Notwithstanding, plaintiff argues that Lyle Stuart nevertheless should be held accountable since he had knowledge of the harmful potential of the diet. Admittedly, Lyle Stuart could have published the book without consulting Dr. Blackburn. In that event plaintiff concedes that he would have no case since Lyle Stuart would have been justified in relying on Dr. Linn's findings. However, plaintiff contends that since Lyle Stuart consulted Dr. Blackburn to verify the material in the book, liability may now attach.

First, to impose liability because a publisher undertook to verify the contents of a publication works to discourage publishers from authenticating or checking into the accuracy of any of their publications. It is better to publish without knowledge of any sort regarding the subject matter and thereby escape the imposition of liability than to verify the contents and face potential liability. It seems perverse to penalize a publisher for exceeding that which the law requires.

Second, as just pointed out, Dr. Linn's background alone was sufficient to provide a basis for the book. Were publishers required to pick and choose between experts with regard to scientific publications (even those geared for the lay public), precious few scientific books or publications would reach the public. Theories, especially scientific

theories, frequently have groups of proponents and opponents. Often each claims the empirical data conclusively proves their theory correct and the other view inaccurate. It would be preposterous to relegate to publishers the responsibility of selecting the correct view. Lyle Stuart relied on Dr. Linn's experience in successfully treating many patients, including Lyle Stuart himself, with the liquid protein diet. Blackburn, a clinical researcher, felt more data was needed. To hold Lyle Stuart liable for relying on his own author, a medical doctor experienced in the area of weight loss, would be to frustrate the purpose of the First Amendment and impose an overwhelming burden on the free flow of ideas in our society.

Plaintiff also asserts that various sections of the Restatement (Second) of Torts should be adopted by this court and applied to the facts of this case.[4]

---

4. Plaintiff relies on sections 302(a), 303, 307, 308, 310, 311, 321, 388, 390, 402(a) and 402(b) of the Restatement (Second) of Torts. We set forth sections 310 and 311 as plaintiff argues those in his brief. Discussion of section 402(a) is deferred to the products liability portion of this discussion.

"§310. *Conscious Misrepresentation Involving Risk of Physical Harm* — "An actor who makes a misrepresentation is subject to liability to another for physical harm which results from an act done by the other or a third person in reliance upon the truth of the representation, if the actor

"(a) intends his statement to induce or should realize that it is likely to induce action by the other, or a third person, which involves an unreasonable risk of physical harm to the other, and

"(b) knows

"(i) that the statement is false, or

"(ii) that he has not the knowledge which he professes."

"§311. *Negligent Misrepresentation Involving Risk of Physical Harm*

"(1) One who negligently gives false information to another is subject to liability for physical harm caused by action

To reiterate the sentiments of the Appellate Court of Illinois, First District, Fifth Division in *Alm v. Van Nostrand Reinhold Co. Inc.*, 134 Ill. App. 3d 716, 720, 480 N.E.2d 1263, 1266 (1985), which stated in reply to plaintiff's urging that it adopt section 311 of the Restatement (Second) of Torts, that "nothing in the comment or the illustrations suggests that the rule was intended to apply to publishers of information supplied by third parties, nor have plaintiffs cited any cases so applying the rule." Likewise, we find the various sections of the Restatement (Second) of Torts, namely sections 302(a), 303, 307, 308, 310, 311, 321, 388, 390 and 402B, not applicable to publishers of information supplied by third parties. Nothing in these sections, the illustrations or the comments thereto, suggests they were meant to be applied to publishers.

Thus, this court finds summary judgment to be properly granted in favor of defendant Lyle Stuart on plaintiff's claims for negligent publication and conscious and negligent misrepresentation.

Plaintiff also alleges causes of action for breach of express and implied warranties, and for strict liability in tort under section 402A of the Restatement (Second) of Torts. Pennsylvania has adopted Article II of the Uniform Commercial Code, 13 Pa. C.S. §2101 et seq., which governs plaintiff's breach of

---

taken by the other in reasonable reliance upon such information, where such harm results

"(a) to the other, or

"(b) to such third persons as the actor should expect to be put in peril by the action taken.

"(2) Such negligence may consist of failure to exercise reasonable care

"(a) in ascertaining the accuracy of the information; or

"(b) in the manner in which it is communicated."

warranty allegations. In particular, sections 2313 and 2314 of that article, 13 Pa. C.S. §§2313, 2314 (1984), deal with the express and implied warranties at issue. Pennsylvania also recognizes the doctrine of strict liability as set forth in the Restatement (Second) of Torts section 402(a). See *Schriner v. Pennsylvania Power and Light Co.*, 348 Pa. Super. 177, 501 A.2d 1128 (1985); *Webb v. Zern,* 422 Pa. 424, 220 A.2d 853 (1966). As stated in *Schriner* at 185, 501 A.2d at 1132:

"When we distill section 402 A into its constituent elements, we find that the following are necessary to an appropriate application of this section:

"(1) a product;

"(2) a sale of that product;

"(3) a user or consumer;

"(4) a defective condition, unreasonably dangerous; and

"(5) causation — that the product caused physical harm to the ultimate user or consumer, or to his property.

"If any of these requisite elements remains unsatisfied, section 402A has no applicability."

The express and implied warranty sections of Article II of the code apply only to "transactions in goods." 13 Pa. C.S. §2102. "Goods" are defined as "all things (including specially manufactured goods) which are moveable at the time of identification to . the contract for sale. . . ." 42 Pa. C.S. §2105(a). Courts have been unwilling to hold that the contents of a book or a publication is a "good" or a "product" for purposes of U.C.C. warranties or for section 402A purposes. See *Cardozo v. True,* 342 So.2d 1053 (1977); *Herceg v. Hustler Magazine Inc.,* 565 F.Supp. 802 (1983).

*Cardozo* distinguished between the physical characteristics of a book — the pages, binding,

print, etc. — from the ideas, or content, contained therein. The physical characteristics fell within the definition of goods for section 2105 purposes, whereas the court held the contents — the ideas and thoughts in the book — did not. *Cardozo* at 1056. In *Herceg,* the court refused to find the contents of a magazine article or other publication was a product within the meaning of section 402A of the Restatement (Second) of Torts. *Herceg*, 565 F.Supp. at 803. *Herceg* cites approvingly to *Cardozo* in observing no appellate court has held the contents of a book a "product" within section 402A of the Restatement (Second) of Torts or a "good" within the definition of goods for U.C.C. Article II purposes.

Plaintiff cites *Kercsmar v. Pen Argyl School District* 1 D&C.3d 1 (1976) for the proposition that a book's contents are a product within the scope of the Uniform Commercial Code, 13 Pa. C.S. §2102 (1984). We find *Kercsmar* unpersuasive for several reasons and limit it to its facts. Plaintiff there was injured performing a high school chemistry experiment according to the instructions of the textbook. The Northampton County Court of Common Pleas rejected defendant publisher and author's preliminary objections to plaintiff's claim for breach of implied warranties under the Uniform Commercial Code, holding the chemistry experiment described in the text subject to the Uniform Commercial Code warranties. In the 12 years since *Kercsmar* was decided, no court has followed the *Kercsmar* view, rather the view has been rejected as witnessed by the *Cardozo* and *Herceg* decisions. *Kercsmar* does not set precedent on this court as it hails from the common pleas level in Pennsylvania, as does this court. Further, in light of the First Amendment concerns discussed earlier in this opinion and the more

recent cases dealing with publisher's liability we see no indication of the *Kercsmar* view being adopted. Thus, we conclude the contents of the book at issue in this case are not subject to the Uniform Commercial Code warranties.

Plaintiff relies upon cases upholding liability on printers of aviation and nautical charts in support of his argument that liability be imposed on Lyle Stuart in this matter. Plaintiffs have recovered on theories of negligent misrepresentation and strict products liability where defective charts caused injuries. See *Saloomey v. Jeppeson and Company,* 707 F.2d 671 (2d Cir. 1983); *Reminga v. United States,* 631 F.2d 449 (6th Cir. (1980); *DeBardekebon Marine Corp. v. United States,* 451 F.2d 140 (5th Cir. 1971). These cases are distinguishable in that printers of such charts supply a particular, narrow group of users, not indeterminate numbers of the general public. Reliance on the accuracy of the charts by the users is obvious. As such, the imposition of a duty of care upon printers of the charts or finding such charts products within the scope of 402A has been accepted. Such charts and maps clearly more resemble a product such as a compass or a radio, than they do a book on matters of public concern. Moreover, the First Amendment concerns raised in this case simply do not present themselves in cases regarding aviation and navigation charts.

No appellate court has held the contents of a book to be a "product" within section 402A of the Restatement (Second) of Torts, or a "good" within the meaning of "goods" in Article II of the Uniform Commercial Code as adopted in Pennsylvania, 13 Pa. C.S. §2101 et seq. Therefore, as this court adheres to this view, summary judgment is properly granted in defendant's favor as against plaintiff's claims in that regard.

Next, we consider plaintiff's claim for compensatory and punitive damages for the intentional infliction of emotional distress. Although somewhat obscure, we discern such a cause of action alleged in the fifth cause of action in plaintiff's complaint. Curiously, neither party addressed the issue in their briefs or at oral argument. For the reasons that follow, we find summary judgment properly granted in defendant's favor as to this cause of action as well.

Pennsylvania has adopted section 46 of the Restatement (Second) of Torts approach to the tort of intentional infliction of emotional distress. *Hoffman v. Memorial Osteopathic Hospital,* 342 Pa. Super. 375, 492 A.2d 1382 (1985). Section 46 provides:

"(I) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."

Comment d to section 46 states "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." The threshold question for the court's determination is whether the conduct complained of may reasonably be regarded as so extreme and outrageous as to permit recovery. Restatement (Second) of Torts §46, comment h; *Dawson v. Zayre Dept. Stores,* 346 Pa. Super. 357, 499 A.2d 648 (1985).

In evaluating a motion for summary judgment, the court must view the evidence in a light most favorable to the non-moving party. *Day v. Volkswagenwerk Aktiengesellschaft, supra.* Even viewing the facts most favorably to the plaintiff, this

court must as a matter of law hold that the conduct of Lyle Stuart does not even approach the level of "going beyond all possible bounds of decency." Thus, plaintiff has no cause of action against Lyle Stuart for the intentional infliction of emotional distress and summary judgment is properly granted.

Finally, in light of the foregoing, this court has made no determination on the merits of defendant's defense that Bantam Books and not Lyle Stuart actually published the paperback version of *The Last Chance Diet* which plaintiff's decedent read.

Accordingly, this court holds summary judgment be granted in favor of defendant Lyle Stuart Inc., as against plaintiff David H. Smith individually, and as administrator of the estate of Patricia Smith.

### ORDER RE DEFENDANT LYLE STUART INC.'S MOTION FOR SUMMARY JUDGMENT

And now, this September 30, 1988, after oral argument heard March 21, 1988 and based on our opinion of this date, it is hereby ordered and decreed that defendant, Lyle Stuart Inc.'s motion for summary judgment is granted in its favor and against plaintiff, David H. Smith, individually and as administrator of the estate of Patricia Smith, deceased.

